**FILED**
AUG 1 2001
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| ACCESS INTERNET GROUP, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CV-00-PT-0367-E |
| ) | |
| GENUITY, INC., f/k/a/ GTE ) | **ENTERED** |
| INTERNETWORKING, INC., ) | |
| ) | AUG 1 2001 |
| Defendant. ) | |

## MEMORANDUM OPINION

This cause comes to be heard upon defendant Genuity, Inc.'s ("Genuity") Motions for Summary Judgment with regard to both plaintiff Access Internet Group, Inc.'s ("AIG") claims, and Genuity's own counterclaim, both filed on May 18, 2001.

## UNDISPUTED FACTS

This case arises out of an ill-fated attempt to ride the waves of technology in the heyday of the dot-com companies. The technical jargon of the computer and internet industry and, even the internet itself, is still relatively new and, therefore, difficult to understand with only basic knowledge and "surfing" experience. Therefore, this court will take a somewhat slower, "this is a computer" approach.

In 1999, three radio executives of the "Alabama 100" FM radio station in Anniston, Alabama, formed the plaintiff, AIG, in order to become an Internet Service Provider ("ISP"). The incorporators decided to embark on this venture after the company that had previously operated as the radio station's ISP, "InternetPort," declared bankruptcy. Furthermore, AIG

1

31

contracted with InternetPort to service InternetPort's then-existing customers, known in the world of internet technology as "end-users." At that time, InternetPort provided internet connection and other services to approximately 630 end-users. Pursuant to the contract between InternetPort and AIG, AIG would receive $15.95 per month from each of these users.

The three incorporators of AIG described themselves as follows:

Jay Freeland is president of AIG, and is the Chief Engineer of the radio station. He has worked for various radio stations for over twenty years and has owned his own businesses and rental property in Calhoun County.

Dale Smith was the Internet Sales Department Manager for the radio station. He has been actively involved in the Internet for five years as a designer of web sites and in the sale of internet services. He has also worked in radio and television advertising sales for over twenty years. He has sold computers and computer systems.

Eva Gibson is the National Sales Manager at the radio station. She has over thirty years' experience in the advertising industry with radio, television, and other advertising outlets.

In order to service the end-users, AIG had to provide a way for them to connect to the internet, a process that involves both computer and telecommunications technology. The ISP must first be able to provide a substantial number of end-users with internet access; further, it is more economical if, when the end-user's phone line connects with the ISP, and, then, to the internet itself, at what's known as a "Point of Presence" ("POP"), a local phone number is used instead of a toll number or long-distance number. Because AIG did not, itself, possess sufficient technology, it was necessary for it to contract for "connectivity" services with a company that could provide them. After interviewing several providers, including BellSouth and Sprint, AIG chose to contract with the defendant for "backbone connectivity," or, physical connection to a POP with a high-speed data line. The contact person for the Genuity/AIG deal was Steve Spencer, a Genuity sales representative whose sales area covered Alabama. Spencer had only recently been hired by Genuity, and the Genuity/AIG contract was his first sale.

The contract that was eventually signed indicated that AIG had chosen the DiaLinx Service and Genuity's "Internet Advantage Gold Service." AIG's obligations under this plan are in dispute, as is AIG's performance of whatever obligations it may have had. Allegedly, the contract was to provide "connectivity" service, local "dial-up" numbers for AIG end-users to use when connecting to AIG, and some level of technical (or "help desk") support, the exact amount and the recipients of which are in dispute.

In order to provide these services, AIG and Genuity executed a series of documents that form the contract(s) at issue. The three major sets of documents in the contract(s) are a one-page-long Master Agreement; a DiaLinx Service Schedule, Quotation, and Service Description, totaling fifteen pages; and, executed over one month later, an Internet Advantage Service Schedule, Quotation, and Service Description, totaling forty-six pages. At first, only the Master Agreement and the DiaLinx documents were signed. Then, after Genuity attempted to provide the DiaLinx service to AIG, Genuity discovered that AIG did not possess the actual high-speed data line that would connect it to the POP. The parties executed the Internet Advantage Service to supply AIG with the high-speed data connection. The data line snafu caused the date of connection, which originally was August 1, 1999, to be delayed; the activation of the Anniston POP occurred around September 1, 1999.[1]

Both parties acknowledge that AIG experienced certain technical difficulties after the high-speed data line was installed; the exact difficulties and the party/parties to whom they should be attributed, however, are in dispute. Nevertheless, regardless of who was responsible for the problems, AIG's customers began to complain about their internet service. AIG hired

---

[1] Neither party points to a "time is of the essence" provision in any of the contract documents.

3

independent engineers in an attempt to solve the problems. No solution could be found, however, and, eventually, AIG lost its account with InternetPort.

On February 11, 2000, AIG filed a complaint against Genuity with this court, alleging breach of contract and fraudulent misrepresentation. On April 17, 2000, Genuity filed an answer and a counterclaim, alleging that AIG had, itself, breached the contract by withholding payment from Genuity.

## DISPUTED FACTS

The disputed facts may be summarized as follows: AIG claims that Genuity promised it certain services that it either failed to perform and/or had no intention of performing when it promised the services, which resulted in damages to AIG. Genuity first responds that it did not make some of those promises, and, even if Spencer had improvidently promised such things, the parties signed a contract that contained contradictory provisions. With regard to promises that it did make, or bargain for, Genuity argues that it supplied them. Genuity asserts, therefore, either that it had no duty to supply the services that AIG claims it failed to supply, or that it did supply those services. The services that the plaintiff alleges were promised by Spencer, Genuity's sales representative, as inducements to enter into a contract, are as follows:

    1) Twenty-four hour/seven-days-a-week technical support for AIG's customers. Note that AIG's customers are the "end users," not AIG itself. AIG was Genuity's customer.

    2) Provision of a "turnkey operation," including all necessary equipment except a customer router, which was to be purchased by AIG.

    3) Dial-up service in target areas outside Anniston, including Heflin, Talladega, Boaz, Gadsden, Camden, and Calcutta, India. This promise seems to go hand-in-hand with number (4).

    4) Delivery of master CD for duplication (of local dial-up numbers).

    5) Fully operational network within thirty (30) days of the DiaLinx contract.

4

  6) Ability to host websites.

See Plaintiff's Opposition, pp. 4, 14. The services that AIG claims were included in the contract, but were not provided by Genuity, are as follows:

  7) A marketable and properly working dial-up service.

  8) E-mail service accessible to end-users (AIG's customers).

  9) Failure to provide Enterprise Advantage services.

Specifically, Genuity denies promising numbers (1), (3), (4), (6), (8), and (9), and claims that it delivered numbers (2) and (7). With regard to number (5), Genuity, already noted, when it was ready to install the DiaLinx network, discovered that AIG did not have a critical piece of hardware: the high-speed data transmission wire. The parties apparently had to enter into another contract in order for AIG to purchase the wire and for Genuity to install the network. This court has also noted that neither party has pointed to a "time is of the essence" provision in the contract. With regard to number (6), Genuity argues that AIG not only had the ability to host websites on its network, but <u>did</u> host websites.

## ARGUMENT

  This case is riddled with mixed questions of fact and law. With regard to the AIG's claims of oral promises, Genuity argues, in essence, that the contract terms are unambiguous, and the agreement is fully integrated. Therefore, oral representations should not be used to amend the clear contractual terms. With regard to AIG's claims that Genuity breached terms contained within the four corners of the contract, Genuity argues that its actions did not, in fact, breach the clear terms of the contract. Further, concerning AIG's fraudulent misrepresentation claims relating to the alleged oral promises, Genuity contends that, even if such oral promises occurred, which it flatly denies, AIG's reliance on them, in the face of unambiguous,

5

contradictory contract provisions, is unreasonable. AIG argues that the contract terms are indeed ambiguous and voluminous, that Genuity, in fact, breached certain contract provisions, and that AIG, composed of unsophisticated, technologically uninitiated incorporators, reasonably relied upon Spencer's oral promises. In a page-long response to Genuity's motion for summary judgment on its counterclaim for breach of contract based upon failure to pay, AIG contends that too many questions of fact exist to allow for summary judgment on any claim, at present.

The court is able to sub-divide this case into four parts, which it will address separately, as follows.

## BREACH OF CONTRACT

AIG alleges that Genuity breached the contract by failing to perform both express terms of the contract, and by failing to perform certain promises made by Spencer that, AIG argues, should become terms of the contract. AIG argues that the contract is ambiguous. It further claims that there was fraud in the inducement of the contract.

### Is the contract ambiguous?

Under Massachusetts law, the interpretation of a written contract is a question of law.[2] Lexington Ins. Co. v. All Regions Chem. Labs, Inc., 419 Mass. 712, 713 (1995). If the contract's terms are unambiguous, then the contract must be enforced according to its terms, in accordance with its ordinary and usual sense. Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992). If an ambiguity exists, however, the court should consider "the entire instrument and the general scheme it reveals to determine the significance and meaning of the ambiguous terms." Glick v. Greenleaf, 383 Mass. 290, 296 (1981). The court may examine the

---

[2] The parties have stipulated that, because the contract contained a choice of law provision in favor of Massachusetts law, the law of Massachusetts applies to the breach of contract issues.

extrinsic circumstances surrounding the contract formation. <u>Radio Corp. v. Raytheon Mfg. Co.</u>, 300 Mass. 113, 117 (1938). If the ambiguity still exists, the language of the contested clause is to be reasonably construed against the party that made the contract. <u>Shea v. Bay State Gas Co.</u>, 383 Mass. 218, 225 (1981).

At the outset, this court must determine whether the contract is unambiguous, as Genuity argues, or ambiguous, as AIG asserts. The court notes, however, that a contract is not ambiguous simply merely because the parties disagree on the meaning of its terms or provisions, but, instead, is ambiguous if "[its] terms are inconsistent on their face or where the phraseology can support reasonable difference[s] of opinion as to the meaning of the words employed and obligations undertaken." <u>Coll v. PB Diagnostic Syss., Inc.</u>, F.3d 1115, 1122 (1st Cir. 1995).

<u>Twenty-four hour technical support for AIG's customers (end-users)</u>

Genuity acknowledges that is provides twenty-four hour technical support to ISP end-user customers at a monthly rate of $5 per end-user. Genuity also notes that the DiaLinx Wholesale Rate Schedule offers the service under the category "Additional Services." However, the DiaLinx Service Description states, under the heading "Support":

> "The DiaLinx service provides, at no additional cost, Level Two Help Desk support to the identified Technical Contact provided in advance by the <u>contracted DiaLinx service customer</u>. Technical contacts can reach [Genuity] for DiaLinx service via the 24-hour hotline. <u>The customer must provide Level One Help desk support for end users</u>."

(emphasis added). Genuity further points to the DiaLinx Service Schedule, which states, under the heading "Responsibility for End Users":

> "<u>[AIG] shall be responsible for providing all technical and business support related to DiaLinx Service access for end users, including but not limited to</u> responding to inquiries and questions, <u>hotline support, problem resolution</u>, providing system configuration, installation and support as applicable and other such services, and shall maintain an organization which is highly trained and qualified to provide such support."

7

(emphasis added). Genuity contends that AIG has provided no evidence to contradict the express contract terms. It argues that AIG has offered no proof that it ordered the service. It also notes that ordering the service at $5 per month per end-user would cause AIG, already obligated to pay a large amount of monthly fees to Genuity, to incur a loss every month as to every end-user. In addition to the alleged oral representation of Spencer, AIG appears to rely on a provision in the Internet Advantage Service Quotation, which reads as follows:

> "Internet Advantage Gold Connection Service is monitored and maintained by GTE Internetworking 24 hours a day, 365 days a year by experienced operators, technicians, and analysts . . . ."

AIG also notes that during initial negotiations with Genuity, AIG completed a document entitled "DiaLinx Customer Information Form," a questionnaire that, AIG claims, inquired of AIG the types of services that AIG expected from Genuity. AIG claims that, in that document, it specified that it wanted Genuity to provide "end user help desk support." AIG does not appear to argue that the Customer Information Form is included in the documents forming the actual contract.

A "turnkey operation," complete with all necessary equipment except a customer router

Neither party defines a "turnkey operation," referred to elsewhere in the parties' briefs as a "turnkey solution." AIG apparently believes that it was not provided with one. Genuity, on the other hand, claims that the DiaLinx Service and the Internet Advantage Service are, by their nature, "turnkey solutions." Genuity quotes, first, the Internet Advantage Service Description, which states that "The Gold service level is a comprehensive, turnkey solution in which the Internet access premises equipment is provided and managed by [Genuity]." Next, Genuity quotes the DiaLinx Service Description, which states that "DiaLinx is a high-availability, nationwide remote access service that provides businesses with a cost effective, turnkey solution

to connect customers to corporate intranets, extranets, and the Internet."

With regard to the equipment allegation, it is unclear which piece of equipment that AIG is claiming Genuity promised to provide, but did not provide. Genuity explains that the Internet Advantage Gold level service includes the high-speed data line, and the Customer Premises Equipment ("CPE"), which, it claims, in AIG's case, included a Channel Servicing Unit/Digital Service Unit ("CSU/DSU") router. The router is necessary to connect the external communications circuit, separate from AIG's premises, to AIG's internal network and servers, also known as the "host." After attaching all the necessary equipment, Genuity then "configures" the connection to ensure that reception and transmission of data can take place. However, according to Genuity, the Internet Advantage Service Description provided for a "demarcation line," a point at which Genuity's responsibility to provide equipment would end, and, after which, AIG would have to assume responsibility for all necessary equipment. That demarcation point, according to the Internet Advantange Service Description, left AIG to provide, "configure," install, and maintain its own "TCP/IP [internet server] and SMTP [email] software on their Internet computing systems (hosts and/or servers). [Genuity] does not undertake detailed design or configuration of the customer's LAN or hosts as part of the Internet Advantage service." Furthermore, the DiaLinx Service Description contained a section entitled "Site Planning and Preparation," which stated that:

> "Customer responsibilities include establishment of a Level One (end user) Help Desk to directly support end users, distribution and setup support for client browsers and the DiaLinx Connection Manager dialer, and operation of email and news servers."

Genuity argues that this language places on AIG's shoulders the responsibility to decide what kinds of equipment to use on its side of the Gold service level's line of demarcation, including an internet server, email software, web hosting servers, etc. In response, AIG cites to

9

the Internet Advantage Service Quotation, which states that:

> "GTE Internetworking provides <u>all required</u> customer premises equipment."

(emphasis added). AIG further quotes the Internet Advantage Service Quotation:

> "The typical Internet access premises equipment package consists of a TCP/IP router, CSU/DSU, RJ45 loopback connector, transceiver/adapter, and associated cables. . . . To ease installation, equipment obtained from GTE . . . for Gold or Silver level customers may be either pre-configured before delivery to the customer or remotely configured by GTE Internetworking after it is connected to the network."

Later in the Service Quotation:

> "The Internet Advantage router and associated premises equipment are installed at the customer site, and IP connectivity to the Internet (including routing outside GTE Internetworking networks) exists."

AIG has not specified the pieces of equipment that it needed that Genuity did not provide. Furthermore, AIG has not alleged a defect in the system provided by Genuity that caused it to fall short of a "turnkey operation" or "turnkey solution."

<u>Local Dial-up service in target areas outside Anniston, including Heflin, Talladega, Boaz, Gadsden, Camden, and Calcutta, India.</u>

Genuity argues that there are no written representations in the contracts that specify that all of the above cities would be available for local dial-up service. Genuity also notes that DiaLinx access is available in Talladega, Gadsden, and Calcutta, India. As further support, Genuity points to language in the DiaLinx Service Schedule, under the heading "Network Access Availability Section," to the effect that:

> "Access to the DiaLinx network cannot be guaranteed to you or your end users . . . you agree that we will not be liable for any damages that you or your end users may incur arising out of the use or inability to use the DiaLinx service."

Genuity also appears to argue that, by indicating in a questionnaire submitted to AIG during contract negotiations, that 95% of AIG's customer base was located in Anniston, AIG could not

10

have sustained much damage from a lack of local dial-up access outside of Anniston. Finally, Genuity notes that the DiaLinx documents directed AIG to Genuity's public website, which contained a complete list of local dial-up numbers. Genuity appears to contend that the availability of the website's list put AIG on notice of the limited availability of local dial-up numbers. AIG has not alleged specific instances in which end-users outside of Anniston, Gadsden, or Calcutta, India have required local dial-up service. AIG also has not alleged with specificity how the lack of local dial-up numbers outside of Anniston, Gadsden, and Calcutta, India has injured AIG.

Delivery of master CD for duplication (of local dial-up numbers)

AIG alleges that Spencer represented to it that Genuity would provide a "master CD-ROM" of local dial-up numbers for AIG to copy and distribute to its end-users. AIG claims that Genuity never delivered the CD to AIG. Genuity argues that AIG cannot point to a provision in the contract that obligates Genuity to provide the CD. Genuity claims that, according to the contract, Genuity was to give AIG access to a part of the Genuity website, from which AIG could download the information and create the CD itself. Genuity cites to the DiaLinx Service Description, which states:

> "[Genuity] customizes Microsoft Connection Manager software with DiaLinx local access numbers, 800/888/887 numbers, and international numbers. The Connection Manager dialers is available for Windows 95, Windows 98, and Windows NY clients. DiaLinx service customers are responsible for distributing the client software to their end users."

Genuity also notes that Spencer, in his deposition, claimed that he provided AIG with the website from which AIG was to download the information.

AIG argues that, in the same deposition, Spencer admitted that, at the time that AIG was supposed to have used the website to download the local dial-up numbers, no local dial-up

11

numbers for Anniston existed on the website, even though Genuity knew, from the questionnaire that it has cited above, that 95% of AIG's customer base needed local dial-up numbers for Anniston. The website, therefore, was of little or no help at all in obtaining these dial-up numbers. AIG further asserts that, in his deposition, "Spencer admits discussing a template that could be provided with dial-up numbers." The court notes that admitting that a discussion took place is not conclusive proof of a promise upon which one could reasonably rely. The court also notes, however, that the language from the DiaLinx Service Schedule that Genuity quotes, above, does not mention downloading such information from a website; nor, however, does it mention a "master CD-ROM." It specifies only that AIG is responsible for distributing the information, not for downloading it.

Fully operational network within thirty (30) days of the DiaLinx contract

Genuity asserts that AIG's claim that Genuity promised that the network would be fully operational within thirty days of the DiaLinx contract is a "red herring." This court has already noted that neither party alleged that time was of the essence in the contract. This court also has already noted that the lack of the physical hardware necessary to construct the high-speed data line for AIG came to light after the signing of the DiaLinx contract, and that further discussion, the signing of another contract, and actual the installation of the high-speed line had to take place before the network could be activated. The plaintiff argues that Genuity was responsible for obtaining the high-speed line, and that Genuity's failure to do so delayed the installation. Genuity appears to argue that the high-speed data line was not a part of the DiaLinx contract, but was part of the Internet Advantage contract, which the parties did not know AIG needed until Genuity found that AIG lacked the high-speed data line. Furthermore, Genuity points to an email from Spencer to AIG that states that the Anniston POP would not be fully operational until

the third quarter of 1999. Genuity also argues that it would be impossible for AIG to be damaged by the later activation because it had access to multiple other POP's with which to service its clients. AIG has not responded to these arguments.

A marketable and properly working dial-up service

AIG claims that the "marketable and properly working dial-up service" is an actual provision of the contract, not a representation by Spencer. Genuity maintains that it provided a marketable and properly working service. It asserts that it provided all of the services that it agreed to provide according to the contract terms, and that AIG has offered nothing in support of this claim other than a the termination letter from InternetPort, which actually blames AIG for the service difficulties.

AIG responds by enumerating the problems that it experienced, upon which AIG relies for its assertion that the dial-up service was neither marketable nor properly-working:

      a. Log-on, e-mail service and news group problems;
      b. Downloading problems by end-users;
      c. No duplicatable CD to provide customers;
      d. Problems with Domain Name Service (DNS)
      e. Slow connection speeds;
      f. Lack of on site service;
      g. No competent tech support for AIG from Genuity;
      h. No tech support for end users.

AIG alleges some of these difficulties as independent representations/contractual provisions that Genuity allegedly failed to provide. AIG also claims that it "opened" many "trouble tickets," which this court can only assume is to be likened unto registering complaints. AIG further alleges that, after hiring independent computer consultants to investigate the problems, the "principal engineer" of the computer consultants stated that "the problem was 'on Genuity's side.'"

13

Genuity replies by arguing that none of the above enumerated problems were attributable to Genuity in the contract. Genuity asserts that AIG's complaint is not that customers could not dial into the network or use the internet, but, instead, rests squarely on access to e-mail accounts, which is discussed separately, infra. With regard to the statement of the "principal engineer," Genuity notes that in his deposition, the engineer admitted that he was unfamiliar with the distribution of responsibilities under the contract terms.

E-mail service accessible to end-users (AIG's customers)

AIG alleges that the provision of a "working e-mail system" was not only a promise made to AIG by Spencer, but also one of Genuity's actual obligations in the contract. Genuity argues that AIG's allegations run contrary to the express terms of the contract. Genuity first notes that all of the Internet Advantage Service documents indicate that the above-referenced "line of demarcation," the boundary between services to be provided by Genuity and services to be obtained by AIG, included email servers, equipment, and software in the category of services to be obtained by AIG. Genuity quotes the Internet Advantage Service Description, which states that:

> "The customer is responsible for providing, configuring, installing, and maintaining TCP/IP and SMTP software on their Internet computing systems (hosts and/or servers). [Genuity does not undertake detailed design or configuration of the customer's LAN or hosts as part of Internet Advantage service."[3]

Genuity also notes that when AIG's "chief engineer" attempted to correct the problem with AIG's e-mail, it recommended certain software to be used on AIG's side of the demarcation line, a fact that, Genuity asserts, demonstrates that the problem was not caused by any of AGI's

---

[3] Elsewhere in its brief, Genuity explains that TCP/IP server is internet software, and SMTP is e-mail software. See p. 8, supra.

14

equipment. Further, the chief engineer testified in his deposition that, in his own experience, he had always provided his own internet and e-mail servers and software. Genuity argues that, although AIG's attribution of its customer's e-mail problems to Genuity is incorrect, it did try to help AIG correct the e-mail problem. Genuity claims that AIG did not accept any of its suggestions. Genuity asserts that its own equipment and operations were free from error. Genuity also argues that the fact that the owners of InternetPort, who knew of the Genuity/AIG contract, laid the blame for the problems squarely on AIG, is further evidence that the difficulties were not attributable to anything on Genuity's side of the demarcation line.

<u>Failure to provide Enterprise Advantage services</u>

The Enterprise Advantage services apparently relate to facilitation of hosting websites. Genuity argues that AIG's Enterprise Advantage allegations are devoid of any factual support. Genuity admits that it discussed the Enterprise Advantage service with AIG, but claims that AIG never purchased the product. In support, Genuity points to the deposition of one of AIG's owners, in which he states that AIG was never billed for web-hosting services, and Genuity never paid for them. Since AIG raised this allegation for the first time in its brief in opposition to summary judgment, it provides no response to AIG's arguments.

**Can parol evidence be used to vary or add to the terms?**

Massachusetts adheres to the parol evidence rule, "[t]he rule that written agreements may not be varied or added to by parol evidence of antecedent or contemporaneous negotiations . . . ." <u>Sound Techniques, Inc. v. Hoffman</u>, 73 N.E.2d 920, 923 (Mass. Ap. Ct. 2000)(quoting <u>Frick Co. v. New England Insulation Co.</u>, 198 N.E.2d 433 (1964)). The parol evidence rule is considered by Massachusetts courts to be "a rule of substantive law." <u>Id.</u> Before a court will apply the rule, it must determine whether the written contract was intended by the parties to embody their

15

"complete agreement." Id. at 924 (citing Welch v. Bombardieri, 147 N.E. 595 (1925)). Furthermore, even if this court finds that a merger/integration clause exists in the contract, pursuant to Massachusetts law, the court must refuse to enforce a merger clause if it finds that the clause would operate to "protect[] a party from liability on account of his fraud and deceit . . . ." Id. at 925. The Massachusetts definition of fraud and deceit does not encompass negligent misrepresentation, which occurs when a party has honest intentions, but who makes misrepresentations because he has failed to exercise due care. Id. at 926. In order for a party's fraudulent conduct to override the parol evidence rule, there must be "intentional misconduct." Id.

      Genuity contends that valid merger and integration clauses exist in the contract. AIG does not dispute the existence of the merger and integration clauses, nor does it attempt to argue that the parol evidence rule does not apply in this case, other than to reference its claim of fraud. Therefore, the court will move on to the plaintiff's fraud claim, noting that it will be required to revisit the parol evidence issue, as well as the ambiguity issue.

**FRAUD**

      The parties agree that Alabama law controls the fraud issue. Because the fraud issue may or may not have a bearing on the parol evidence issue, this court may have to exercise sensitivity to the Massachusetts definition of fraud, which, as noted above, includes neither negligent misrepresentation, nor any alleged misconduct that is not intentional. It appears, however, that conduct that falls below intentional conduct may still form a basis for fraud in Alabama. In order to establish a fraud claim under Alabama law, a plaintiff must show: (1) a misrepresentation of material fact by the defendant; (2) made willfully to deceive, <u>recklessly, without knowledge, or mistakenly</u>; (3) that was reasonably relied upon by AIG under the

circumstances; and (4) that caused damage as a proximate consequence. Brushwitz v. Ezell, 757 So. 2d 423, 429 (Ala. 2000); Foremost Ins. Co. v. Parham, 693 So. 2d 409, 421 (Ala. 1997). Therefore, even if AIG prevails upon its fraud claim under Alabama law, it still may not prevail upon its breach of contract claim under Massachusetts law if its conduct lacked an accompanying intent to deceive that is sufficient to override the parol evidence rule. See Sound Techniques, 73 N.E.2d at 925. Keeping the foregoing caveat in mind, the court will examine the parties' arguments regarding AIG's claim of fraud.

Genuity argues that AIG cannot succeed on its fraud claim because it could not, as a matter of law, "reasonably rely" on the alleged representations. Under Alabama law, a party who claims to have been defrauded in a transaction must first establish that it (1) discharged its duty to read the relevant documents underlying the transaction; and (2) could not have learned of the falsity of the defendant's alleged misrepresentations by doing so. Foremost, 693 So. 2d at 421, Ex parte Caver, 747 So. 2d 168, 172-73 (Ala. 1999). Genuity argues that, since AIG admits that it read the documents that form the contract, it cannot credibly argue that they did not reasonably inform AIG of the services that it purchased (and did not purchase). Genuity contends that, pursuant to Alabama law, a fraud claim cannot, as a matter of law, be based on a verbal statement made prior to the execution of a written contract, when the written contract contains provisions that contradict the verbal statements, citing Tyler v. Equitable Life Assurance Society, 512 So. 2d 55, 57 (Ala. 1987). Genuity also cites to Foremost, for the proposition that the law in this area is well-settled: "where the undisputed evidence indicates that a party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a decision to ignore the written contract terms." 693 So. 2d at 421. See also First Family Fin. Serv., Inc. v. Rogers, 736 So. 2d 553, 558

17

(Ala. 1999)("[W]hen a competent adult, having the ability to read and understand an instrument, signs a contract, he will be held to be on notice of all the provisions contained in that contract . . . and will be bound thereby."). [4]

AIG argues that its reliance on Genuity's statements was reasonable because the contract was difficult to understand. AIG relies on Seabol v. Seibert, 782 So. 2d 212 (Ala. 2000), in which the Alabama Supreme Court found that the mortgage contract at issue were so difficult to understand, that the plaintiff, a "reasonable realtor" with a knowledge of real estate transactions, could reasonably have relied upon the oral explanations of his attorney and of the bank representative. AIG claims that the contract documents in the instant case "are technical in their language; composed of multiple inter-related parts; vague in places and often contradictory . . . . subject to more than one arguable explanation or interpretation," and that, therefore, AIG reasonably relied upon Spencer's oral representations. It claims elsewhere in its opposition to summary judgment, that the incorporators of AIG who read and signed the contract were unsophisticated and technologically illiterate. Furthermore, AIG contends that Genuity's admission, in its motion for summary judgment, that it never intended to honor the alleged oral promises, is evidence of intentional fraud. Finally, AIG argues that it is obvious that too many issues of material fact exist, and that Genuity is, in effect, asking this court to decide disputed facts in Genuity's favor.

Genuity replies by arguing that the evidence proffered by AIG itself shows that its principals had extensive business experience in a variety of areas, including computer sales and website design. Furthermore, contends Genuity, the fact that AIG was able to complete a

---

[4] The court queries why anyone so unfamiliar with technology would desire and attempt to, himself or herself, form and operate an internet service provider.

18

detailed questionnaire that asked technologically in depth questions belies its assertion that its principals were technologically inexperienced. Genuity notes that AIG's "chief engineer" testified in a deposition that he found the principals of AIG to have basic knowledge of technical issues, and to possess the ability to operate the computers they purchased. The chief engineer also testified that one of AIG's principals, Smith, had the ability to build computer servers and to implement the network and its hardware and software. Smith himself testified that he had, in the past, designed websites for third parties. Genuity maintains that, by their own representations and actions, the AIG principals possessed the technical knowledge that would enable them to fully understand the contract and its terms. It also notes that, in AIG's brief in opposition to summary judgment, AIG claims that its principals "read the applicable documents, discussed them among themselves, and signed them."

Genuity distinguishes Seabol because the issue in that case was the statute of limitations, and not reasonable reliance, as AIG suggests. According to Genuity, the plaintiff in Seabol brought fraud claims against both his lawyer and the bank representative, and argued, in response to their statute of limitations defense, that he could not have discovered the defendants' fraud from the documents themselves, and, because he relied upon the defendants' representations that the transaction was not fraudulent, the statute of limitations should be tolled until he could reasonably have discovered the fraud. 782 So. 2d at 213. The Alabama Supreme Court agreed that the plaintiff's reasonable reliance on the statements made by his attorney and the bank representative could toll the statute of limitations. Id. at 217. Genuity notes that the court did not address the issue of reasonable reliance as a basis for a claim of fraudulent inducement.

In its reply to AIG's brief in opposition to summary judgment, Genuity notes that AIG's

page-long opposition to AIG's motion for summary judgment on its breach of contract counterclaim mentions both unspecified genuine issues of material fact, as well as unspecified defenses or offsets that should be considered before summary judgment on the counterclaim is granted. Genuity argues that this assertion of defenses and offsets is tantamount to admission that AIG breached the contract by withholding payments. In support of its position that, by withholding payment, AIG breached the contract, Genuity cites to <u>Lease-It, Inc. v. Massachusetts Port Auth.</u>, 600 N.E.2d 599, 601 (Mass. App. Ct. 1992)(when party's sole obligation was to pay for services, party commits material breach when it refuses to pay).

## CONCLUSION

The court concludes that there is an issue of fact as to whether there has been full compliance with the terms of the contract by either or both parties. Further, there may be ambiguities in the contract, which require that the finder of the facts interpret the contractual provisions. The court determines, however, that the plaintiffs, who certainly have more than average sophistication in the computer industry, could not reasonably rely on representations which purportedly differ from the provisions in the contract. The <u>Seabol</u> case is an inapposite case because it does not involve the issue of a party's reading a contract to determine what the party is contracting for. The <u>Foremost</u> case, while not totally analogous is more analogous than <u>Seabol</u>.

The motion will be Denied as to both contract claims and Granted as to the fraud claim. This 20TH day of July 2001,

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE